HERITAGE PUBLISHING
COMPANY, Plaintiff,

v.

Sheila FISHMAN, Special Assistant Attorney General, State of Minnesota, Kristine Eiden, Deputy Commissioner of Commerce of the State of Minnesota, Michael A. Hatch, Commissioner of the Department of Commerce of the State of Minnesota, and Hubert Humphrey, Attorney General, State of Minnesota, Defendants.

No. 3–86 CIV 74.

United States District Court,
D. Minnesota,
Third Division.

May 21, 1986.

Meeks & Fox by Timothy Davis Fox, Little Rock, Ark., and Fuchs Law Office by David K. Nightingale, St. Paul, Minn., for plaintiff, Heritage Publ. Co.

Hubert H. Humphrey, III, Atty. Gen., State of Minn. by John L. Kirwin and Sheila S. Fishman, Sp. Asst. Attys. Gen., St. Paul, Minn., for defendants of State of Minn.

### MEMORANDUM ORDER

ALSOP, Chief Judge.

The above-entitled matter came before the undersigned on the 18th day of March, 1986, upon the motion of plaintiff for an order of this court declaring certain provisions of the Minnesota Social and Charitable Organizations statute, Minn.Stat. Ch. 309, unconstitutional and preliminarily enjoining the State of Minnesota from enforcing the sections at issue. The parties are commended for the manner in which they have put together an extensive record to assist the court in making this difficult determination. The court has considered the record of the case as it is presently constituted and this memorandum order constitutes the court's findings of fact and conclusions of law as required by Fed.R. Civ.P. 52.

### FACTUAL BACKGROUND

Heritage Publishing Company, Inc. (Heritage) is an Arkansas corporation with its principal place of business in North Little Rock, Arkansas. Heritage is a for-profit corporation and employs approximately 400 persons. Primarily, Heritage is engaged in

the business of soliciting contributions for non-profit organizations and charities. In connection with this business Heritage also prints various pamphlets for its clients. Heritage conducts this business from offices in Arkansas, Georgia, Ohio, and North Carolina and solicits contributions on behalf of clients in approximately 34 states.

Heritage has been soliciting within Minnesota since at least 1981. In early 1981, Heritage applied to be registered as a professional fund-raiser with the State of Minnesota. As a part of that process, Heritage filed with the Commissioner of Commerce a bond in the amount of $20,000. Heritage has maintained the bond, however, it has never obtained a license to solicit within the state. Despite not having a license, Heritage has solicited on behalf of the Minnesota Special Olympics for approximately four years.

This litigation arose out of Heritage's solicitation in Minnesota on behalf of the American Christian Voice Foundation (ACVF). Pursuant to its agreement with ACVF, Heritage was to solicit money in Minnesota and other states, and print and distribute booklets authored by ACVF. Under the contract, 75% of the money collected was to be retained by Heritage. Heritage also was to retain an additional 10% of the money collected to cover the cost of printing and distributing the booklets. The remaining 15% was to go to ACVF.

Beginning in September, 1985, Heritage solicited funds in Minnesota on behalf of ACVF. Heritage told prospective contributors that they were calling on behalf of the "Minnesota Child Abuse Program". Through its solicitation campaign, Heritage obtained pledges in the amount of $42,000, of which, approximately $19,000 has been collected to date.

During early autumn 1985, the Charities Unit of the Office of the Attorney General received numerous calls regarding the solicitation campaign being conducted by Heritage. After investigating the complaints, the Commissioner of Commerce (Commissioner) on November 4, 1985, issued a cease and desist order and notice of

right to hearing to Heritage. The order essentially alleged that Heritage had violated Minnesota's laws regarding charitable solicitations by professional fund-raisers and ordered Heritage to cease all activities as a professional fund-raiser in Minnesota. In response, Heritage filed an application to be licensed as a professional fund-raiser with the Commissioner on November 14, 1985. On December 5, 1985, Heritage appealed the cease and desist order and requested a hearing. On January 14, 1986, the Commissioner denied Heritage's application for a license as a professional fund-raiser and ordered that a hearing on the denial of the license be consolidated with the hearing on the cease and desist order.

The combined hearing was held before an administrative law judge on February 26 and 27, 1986. After making findings of fact and conclusions of law, the administrative law judge recommended to the Commissioner that the cease and desist order be made permanent and that Heritage be denied a license to act as a professional fund-raiser within Minnesota. Because of his involvement in the case before this court, the Commissioner delegated the final decision-making responsibility in the Heritage case to a deputy commissioner. In a findings of fact, conclusions of law and order dated April 7, 1986, the Deputy Commissioner ordered, *inter alia*, that the cease and desist order issued on November 4, 1985, be made permanent against Heritage, that Heritage's license to be a professional fund-raiser be denied, and that Heritage be ineligible for licensure until November 15, 1986.

On January 27, 1986, Heritage commenced this action challenging the Minnesota statutory scheme regulating charitable fund-raising. In an order dated February 7, 1986, this court denied Heritage's application for a temporary restraining order. On March 18, 1986, the court heard oral arguments on Heritage's motion for a preliminary injunction.

**STATUTORY SCHEME**

Minnesota has a comprehensive statutory scheme (Chapter 309) regulating charitable

fund-raising.[1] For the sake of clarity, the court will outline the statutory scheme paying particular attention to those sections challenged by Heritage.

Chapter 309 requires that all charitable organizations soliciting funds within Minnesota file a registration statement with the Commissioner. Minn.Stat. § 309.52. Further, charitable organizations which receive contributions in excess of $10,000 must file annual reports with the Commissioner. Minn.Stat. § 309.53.

Chapter 309 requires professional fund-raisers who solicit funds on behalf of charitable organizations within Minnesota to be licensed. Minn.Stat. § 309.531, subd. 1. In conjunction with the application for license, the Commissioner can require a professional fund-raiser to post a bond in an amount not exceeding $20,000. Minn.Stat. § 309.-531, subd. 2. Further, a professional fund-raiser may not solicit on behalf of a charitable organization unless the fund-raiser provides to the Commissioner written authorization to do so from the charitable organization. Minn.Stat. § 309.531, subd. 3. Finally, § 309.531 provides that the Commissioner may require professional fund-raisers to submit regular financial reports. Minn.Stat. § 309.531, subd. 4.

Chapter 309 provides the Commissioner with the power to deny, suspend, or revoke the license of a professional fund-raiser. Minn.Stat. § 309.532. Specifically, the Commissioner may deny any application, or suspend or revoke any license if he finds:

(1) that the order is in the public interests, and (2) that the applicant, registrant, or licensee:

(a) has filed an application for a license or registration which is incomplete in any material respect or contains any statement which, in light of the circumstances under which it is made, is false or misleading with respect to any material fact;

(b) has engaged in a fraudulent, deceptive, or dishonest practice;

(c) is permanently or temporarily enjoined by any court of competent jurisdiction from engaging in or continuing any conduct or practice involving any aspect of charitable solicitation; or

(d) has violated or failed to comply with any provision of this chapter or any rule or order under this chapter. Minn.Stat. § 309.532, subd. 1. The Commissioner may also issue an order requiring a licensee applicant or a licensee to show cause why the license application should not be denied or the license should not be revoked or suspended. Minn.Stat. § 309.532, subd. 3. A hearing held pursuant to the order to show cause procedure may be conducted before an administrative law judge and the orders of the Commissioner arising out of this process are subject to judicial review by the Minnesota Court of Appeals. Minn.Stat. § 309.532, subd. 4 and 5; Minn.Stat. Ch. 14.

Chapter 309 also provides that the Commissioner may investigate whether any person has violated or is about to violate the provisions of the chapter. Minn.Stat. § 309.533, subd. 1. In conjunction with this power, the Commissioner may "administer oaths and affirmations, subpoena witnesses and compel their attendance, take evidence and require the production of any books, papers, correspondence, memoranda, agreements or other documents or records which the Commissioner deems relevant or material to the inquiry." Minn. Stat. § 309.533, subd. 2.

The Commissioner has the power to issue a cease and desist order when it appears to him that a person is engaged or is about to engage in conduct constituting a violation of the chapter. Minn.Stat. § 309.534, subd. 1(a). The cease and desist order must state the reason for the entry of the order and must give notice to the respondent of his right to request a hearing. Minn.Stat. § 309.534, subd. 1(a). When requested, a hearing must be held not later than 7 days after the request and the Commissioner's

---

**1.** The regulation of social and charitable organizations and their fund-raising is generally found in Minn.Stat. Ch. 309, Social and Charitable Organizations. Minnesota Statute Sections 309.50 to 309.61 are set out in the Appendix to this Order. When appropriate, the court will set out in the main text specific statutory language.

decision must be issued within 20 days of the date of the hearing. *Id.* As an alternative, the Commissioner may also bring an action in state district court to enjoin the conduct of an individual violating the chapter. Minn.Stat. § 309.534, subd. 1(b).

The chapter provides that the statements, reports and other documents filed with the Commissioner are public records. Minn.Stat. § 309.54. Further, charitable organizations which are required to file annual reports in Minnesota must maintain in Minnesota original or true copies of books and records pertaining to all money or other property collected from Minnesota residents and pertaining to the disbursement of such money or property. Minn. Stat. § 309.54, subd. 3.

The chapter also places limitations on how much charities may expend or agree to expend for management and the cost of fund-raising. Section 309.555, subd. 1a provides that a charitable organization may not expend or agree to expend an unreasonable amount for management, general costs, and fundraising costs. An amount expended or agreed to be expended in excess of 30% is presumed unreasonable and an amount of less than 30% can be challenged as unreasonable. *Id.* Expenditures in excess of 30% are recoverable by the state from the charitable organization. *Id.* The section also provides the same limitation on a professional fund-raiser who receives or agrees to receive an unreasonable amount for management and fund-raising costs. Minn.Stat. § 309.555, subd. 1b. In determining their management and fund-raising costs, a professional fund-raiser or charitable organization may deduct the actual cost of goods or services provided to the public in connection with the charitable solicitation. Minn.Stat. § 309.555, subd. 2. A charitable organization may assert as a defense that fund-raising costs and management and general costs in excess of 30% are reasonable due to extenuating or mitigating circumstances. Minn.Stat. § 309.555, subd. 5. Finally, § 309.555 requires that agreements between charitable organizations and professional fund-raisers must be in writing and that a copy of the writing must be filed with the Commission-

er. Minn.Stat. § 309.555, subd. 4(a). The writing must disclose the amount of compensation that is to be retained by the fund-raiser and must disclose the percentage of the total amount collected by the fund-raiser that is to be given to the charitable organization. Minn.Stat. § 309.555, subd. 4(b) and (c).

In connection with any charitable solicitation, the chapter requires that the charitable organization on whose behalf the solicitation is made be fully identified and the percentage of the contribution which may be deducted as a charitable deduction on their state and federal income tax be stated. Minn.Stat. § 309.556, subd. 1. Further, if a professional fund-raiser is soliciting the contributions, the fund-raiser must disclose the percentage of the total amount solicited which will be received by the charitable organization for charitable purposes. Minn.Stat. § 309.556, subd. 2. Finally, the chapter provides the Commissioner with rule-making authority to carry out the provisions and purposes of the chapter. Minn. Stat. § 309.532, subd. 2; § 309.591.

## PRELIMINARY LEGAL ISSUES

### I. Standing

■ Heritage claims standing in this case both to assert its own legal rights and to assert the legal rights of its client charities based on the concept of *jus tertii.* The defendants do not seriously contest Heritage's standing to assert its own legal rights in this case. The defendants do contest Heritage's standing to assert the legal rights of its client charities.

Pursuant to Article III of the United States Constitution, the power of the federal courts is limited to adjudicating actual "cases and controversies". *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). To meet the requirements of Article III, Heritage must demonstrate that it has suffered an actual or threatened injury, that the injury is fairly traceable to the defendants' conduct, and that there is a substantial likelihood that the relief re-

quested will redress the injury. *Id.* at 472, 102 S.Ct. at 758. In the present case there is little doubt that Heritage has suffered an actual economic injury directly caused by the cease and desist order of the Commissioner of Commerce. Heritage is asking the court to enjoin the Commissioner from enforcing the statutes invoked by the Commissioner in denying Heritage the right to solicit funds in Minnesota. It is thus clear that if Heritage obtains the relief it is requesting, its injury will be redressed. Therefore, Heritage has met the requirements of Article III and has standing to assert its claims before this court.

Heritage seeks not only to assert its own rights, however, but also seeks to assert the First Amendment rights of its client charitable organizations. As a general rule, a plaintiff is only permitted to assert his own legal rights and interests and cannot assert the claims, rights or interests of third parties. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). There are exceptions to this prudential consideration. For example, when there are practical obstacles preventing the party from asserting its own rights, the court has recognized the doctrine of *jus tertii* standing. Heritage seeks *jus tertii* standing to assert the First Amendment rights of its client charities.

The United States Supreme Court has explained the concept of *jus tertii* standing in the First Amendment context.

> Within the context of the First Amendment, the court has enunciated other concerns that justify a lessening of prudential limitations on standing. Even where a First Amendment challenge should be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging this statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having this statute challenged. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."

*Secretary of State of Maryland v. Joseph H. Munson Company,* 467 U.S. 947, 956–57, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).). The *Munson* case is also instructive because it is factually similar to the case before this court. *Munson* was a professional fund-raiser whose customers included various charitable organizations in the state of Maryland. 467 U.S. at 950, 104 S.Ct. at 2843. Maryland had a statutory scheme regulating the fund-raising activity of professional fund-raisers. *Id.* at 950–51, 104 S.Ct. at 2843–44. Munson brought its case challenging the constitutionality of that statutory scheme based primarily on the First Amendment rights of its clients. The United States Supreme Court found that Munson sought to protect activity that was at the very heart of its business relationship with its clients and that Munson's interests in challenging the statute were completely consistent with the First Amendment interests of its clients. *Id.* at 958, 104 S.Ct. at 2848. As a result, the Supreme Court concluded that Munson was entitled to standing to challenge the statutory scheme based upon the First Amendment rights of its client charities. *Id.* at 959, 104 S.Ct. at 2848.

Heritage is also a professional fund-raiser seeking to challenge a regulatory scheme based upon the First Amendment rights of its client charities. As in *Munson,* the business relationship between Heritage and its clients is directly related to the First Amendment rights of Heritage's clients. Further, Heritage's interests in challenging the Minnesota statutory scheme are consistent with the First Amendment interests of its clients. Although Heritage's interests are not identical to those of its clients, on the record

before the court, it is clear that Heritage has properly framed the First Amendment issues and has presented them with the necessary adversarial zeal. *See Craig v. Boren,* 429 U.S. 190, 193–94, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976).

As noted by the *Munson* court, there is also a concern in a First Amendment case that a charitable organization would not be willing to challenge a statutory scheme. This concern is reflected in the affidavit of Dennis Brueggemann, the Executive Director of the Minnesota Special Olympics. Mr. Brueggemann was reluctant to execute his affidavit detailing the relationship between the Minnesota Special Olympics and Heritage for fear that it might somehow affect his present and future relations with the Minnesota Department of Commerce and the Minnesota Attorney General's Office. In particular Mr. Brueggemann was concerned that his involvement in the action would jeopardize the present and future fund-raising campaigns of the Minnesota Special Olympics. The danger of this chill upon the free speech rights of Mr. Brueggemann and the Minnesota Special Olympics further indicates that this court should permit Heritage to adjudicate the constitutionality of the Minnesota statutory scheme. *See Munson,* 467 U.S. at 958, 104 S.Ct. at 2848.

In conclusion, the court will grant standing to Heritage to challenge the Minnesota statutory scheme based upon its own legal rights and the First Amendment rights of its client charitable organizations.

## II. Abstention

■ The defendants assert that this court should abstain from deciding this case based upon the principles set forth in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Abstention is a judicially created exception to the jurisdiction of federal courts as set forth in Article III of the Constitution. In general, the doctrine of abstention permits federal courts to decline or postpone the exercise of their jurisdiction to permit a state court to decide the matters at issue.

*Colorado River Water Conversation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). However, abstention is a narrow exception to the jurisdiction of the federal courts and the Supreme Court has emphasized that "abstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* at 813, 96 S.Ct. at 1244.

Pursuant to the doctrine of *Pullman* abstention, a federal court should abstain from deciding difficult and unsettled questions of state law required to be resolved as a prerequisite to deciding a substantial federal question. 312 U.S. at 500, 61 S.Ct. at 645. The rationale underlying *Pullman* abstention, is that federal courts, should avoid the unnecessary adjudication of federal questions and should permit state courts to resolve issues of their own law. *Id.* However, abstention is not appropriate when the resolution of the state law question is unlikely to resolve the federal constitutional question. *Harman v. Farsenius,* 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965). The Minnesota statutory scheme before this court has not been refined by the Minnesota judiciary. However, regardless of how the Minnesota courts might fine tune Chapter 309, the principal issue before this court, whether the chapter is substantially overbroad in violation of the First Amendment to the United States Constitution, will still need resolution. Therefore, *Pullman* abstention is inappropriate.

Pursuant to the doctrine of *Younger* abstention, federal courts should abstain from jurisdiction when the federal question has been or could have been brought in an ongoing state proceeding. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Hawaii Housing Authority v. Midkoff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). The Supreme Court has articulated a three-prong approach for determining when *Younger* abstention is appropriate:

(1) whether there are ongoing state judicial proceedings;

(2) whether the state judicial proceedings implicate important state interests; and

(3) whether there is an adequate opportunity in the state judicial proceedings to raise the federal constitutional question. *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 433, 102 S.Ct. 2515, 2522, 73 L.Ed.2d 116 (1982). *Younger* abstention is inappropriate in this case since there is no ongoing state judicial proceeding. In this case there have been only administrative proceedings which do not require *Younger* abstention. *Hawaii Housing Authority v. Midkoff,* 467 U.S. at 237–39, 104 S.Ct. at 2327–28.

## PRELIMINARY INJUNCTION

Heritage has moved this court for an order declaring that certain provisions of the Minnesota Charitable Organizations statute are unconstitutional and preliminarily enjoining enforcement of the statute. In determining whether to issue a preliminary injunction, this court must consider " ... (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981). Under this test it is clear that the movant must establish the threat of irreparable harm before a preliminary injunction may be issued. *Id.,* n. 9. However, the Eighth Circuit Court of Appeals instructs that in balancing the equities in a particular case, no single factor should be determinative. *Id.* at 113. The central question according to the Eighth Circuit " ... is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

The first factor is the threat of irreparable harm to the movant. Heritage asserts that it is being irreparably harmed by the defendants enforcement of Chapter 309 in the form of damage to its reputation and interference with its and its client's freedom of speech and expression. It is be-yond dispute that a party can meet the irreparable harm requirement by showing that a statute interferes with the exercise of its constitutional rights. *Planned Parenthood v. Citizens for Community Action,* 558 F.2d 861, 867 (8th Cir.1971); 11 C. Wright, A. Miller & F. Elliott *Federal Practice and Procedure* § 2948, at 440 (1973). Therefore, Heritage has adequately shown irreparable harm.

The second and fourth *Dataphase* factors are closely related in this case. The state officials being sued in this case are carrying out the chapter not for their own personal benefit, but rather for the public's benefit as defined by the legislature. The chapter is designed to protect the public from fraudulent and dishonest conduct by charitable fund-raisers. It is clearly in the public interest to prevent fraudulent and dishonest conduct. To the extent that the statute prevents such conduct, it is in the public interest to have it enforced. Therefore, the potential irreparable harm to Heritage and its client charities is balanced by the potential harm to the state and its citizens if the preliminary injunction is granted.

Since the first, second, and fourth *Dataphase* factors tend to balance one another, the critical factor in this case is the possibility of success on the merits. Therefore, the court will give this factor substantial consideration.

The first problem confronted by the court is the level of First Amendment protection to be afforded to charitable solicitation. This issue was dealt with in some detail in the case *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). In *Schaumburg,* Citizens for a Better Environment (CBE) challenged a village ordinance which prohibited door-to-door or on-street solicitation of contributions by charitable organizations that did not use at least 75% of the receipts for charitable purposes. *Id.* at 622–25, 100 S.Ct. at 828–30. The United States Supreme Court, in deciding this case, had to first decide the level of First Amendment

protection charitable appeals for funds were entitled. After reviewing their prior cases, the Court summarized as follows:

Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease. Canvassers in such contexts are necessarily more than solicitors for money. Furthermore, because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech.

*Id.* at 632, 100 S.Ct. at 833–34. The court concluded that charitable solicitations are protected by the First Amendment and that the issue is whether a governmental entity exercises its power to regulate solicitation in a manner which does not unduly intrude upon free speech. *Id.* at 633, 100 S.Ct. at 834.

In the case, *Secretary of State of Maryland v. S.H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the Supreme Court again faced the issue of how much First Amendment protection charitable solicitation is entitled. In *Munson,* a professional fund-raiser, asserting the interests of its clients, was challenging a Maryland statute which prohibited a charity from paying expenses in connection with any fund-raising activity in excess of 25% of the amount raised. *Id.* at 950–51, 104 S.Ct. at 2843–44. The court reaffirmed its

holding in *Schaumburg,* noting that charitable solicitations are so intertwined with speech that they must be afforded the protections of the First Amendment. *Id.* at 959, 104 S.Ct. at 2848.

In light of *Schaumburg* and *Munson,* it is clear that Heritage and its client charities are entitled to the protections of the First Amendment in their solicitation activities. Further, it is clear that while Minnesota can regulate charitable solicitation, it must do so in a manner that does not unduly intrude upon the First Amendment. *Schaumburg,* 444 U.S. at 620, 100 S.Ct. at 827.

The Supreme Court in *Munson* and *Schaumburg* laid out a three part test for analyzing a statute affecting the solicitation of funds for charities. *Munson,* 467 U.S. at 960–61, 104 S.Ct. at 2849; *Schaumburg,* 444 U.S. at 636–37, 100 S.Ct. at 836. The test is:

1. whether the statute constitutes a direct and substantial limitation upon free speech;

2. whether the governmental entity is protecting with the statute a strong subordinating interest that it is entitled to protect; and

3. whether the statute is narrowly drawn to serve the interest without unnecessarily interfering with free speech. The court will consider each part of the test in turn.

The first question is whether Chapter 309 constitutes a direct and substantial limitation on the free speech interests of Heritage and its client charities. In general terms, Chapter 309 requires professional fund-raisers to be licensed, gives the Commissioner the power to grant and deny licenses, gives the Commissioner the power to issue cease and desist orders when he finds conduct contrary to the chapter, requires charities and professional fund-raisers to make certain disclosures and limits (with the potential for exception) the costs of fund-raising to 30% of income. In both *Schaumburg* and *Munson* the principal challenge to the statutes at issue was the

limitation on fund-raising costs to 25% of the revenue raised. The Supreme Court found in both cases that the fund-raising cost provision was a direct and substantial limitation on free speech. *Munson*, 467 U.S. at 967, 104 S.Ct. at 2853; *Schaumburg*, 444 U.S. at 636, 100 S.Ct. at 836. In this case, the Minnesota statute limits fund-raising costs to 30% of the revenue raised. As in *Munson*, the statute provides for the possibility of an exception. The change from 25% in *Munson* to 30% in this case is not sufficient to warrant a finding that the chapter is not a direct and substantial limitation on free speech. Further, the other provisions of the chapter, as outlined above, also directly and substantially limit free speech.

■ The second question is whether Minnesota is protecting a strong subordinating interest with the statutory scheme that the state is entitled to protect. In *Schaumburg*, the Village asserted that its statute was designed to protect the public from fraud, crime and undue annoyance. 444 U.S. at 636, 100 S.Ct. at 836. The Supreme Court found that these were interests that the Village was entitled to protect. *Id.* at 637, 100 S.Ct. at 836. In *Munson*, the Supreme Court noted that Maryland's purpose in enacting the statutory scheme was to prevent mismanagement and fraud. 467 U.S. at 966 n. 14, 104 S.Ct. at 2852 n. 14. The court, implicitly at least, found these interests legitimate. *Id.* at 964–68, 104 S.Ct. at 2851–53. Minnesota asserts that Chapter 309 is designed to protect the public from fraud and misrepresentation, to insure that prospective contributors are adequately informed, and to preserve public funds. Under *Schaumburg* and *Munson*, these are clearly strong, subordinating interests that Minnesota is entitled to protect.

■ The ultimate question thus becomes whether the Minnesota statutory scheme is narrowly drawn to serve its strong subordinating interests without unnecessarily interfering with free speech. Chapter 309 has a severability clause. Minn.Stat. § 309.61. Thus, if it is found that only a portion of the statutory scheme is not narrowly drawn, that portion can be found unconstitutional without invalidating the whole. The court will first consider the statutory sections dealing with the licensing of professional fund-raisers, second consider the statutory sections dealing with the Commissioner's powers to investigate potential fraud and issue cease and desist orders, and finally consider the statutory sections that either limit the manner in which charities raise funds or require charities to disclose information.

As noted earlier in this order, Minn.Stat. § 309.532 requires professional fund-raisers to obtain a license before operating in Minnesota and sets out the criteria upon which the Commissioner can deny a license. Section 309.532 brings into direct conflict the power of a government to license and regulate those who wish to pursue a professional calling with the rights of free speech protected by the First Amendment. As discussed earlier in this order, charitable solicitation is entitled to the protections of the First Amendment. On the other hand, it is equally clear that a state may regulate a profession to insure that individuals working within it maintain high standards. *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 460–61, 98 S.Ct. 1912, 1920–21, 56 L.Ed.2d 444 (1977); *Virginia Pharmacy Board v. Virginia Citizens Consumer Counsel*, 425 U.S. 748, 766, 96 S.Ct. 1817, 1828, 48 L.Ed.2d 346 (1976); *Goldfarb v. Virginia State Bank*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1974). The power of the state to regulate a profession is most clearly expressed in *Goldfarb*, in which the Supreme Court stated:

> We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.

421 U.S. at 792, 95 S.Ct. at 2016.

■ The power to regulate professions, however, must be balanced against the

First Amendment rights of the professional and the professional's clients. The competition between these interests was explained by Justice Jackson in a concurring opinion in *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed.2d 430 (1945). Justice Jackson stated:

Though the one may shade into the other, a rough distinction always exists, I think, which is more shortly illustrated than explained. A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views. Likewise, the state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought. So the state to an extent not necessary now to determine may regulate one who makes a business or a livelihood of soliciting funds or memberships for unions. But I do not think it can prohibit one, even if he is a salaried labor leader, from making an address to a public meeting of workmen, telling them their rights as he sees them and urging them to unite in general or to join a specific union.

This wider range of power over pursuit of a calling than over speech-making is due to the different effects which the two have on interests which the state is empowered to protect. The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system.

*Id.* at 544–45, 65 S.Ct. at 329. The task of this court is to determine whether the criteria which the state establishes for entry into the profession of fund-raiser in some way infringes upon the First Amendment rights of the party seeking entry. For example, it is clear that Minnesota could not deny a license to a professional fund-raiser based upon the fund-raiser's political or religious statements or beliefs.

■ Section 309.532 permits the Commissioner to deny, suspend or revoke a license if he finds that it is in the public interest to do so *and* he also finds that the professional fund-raiser has filed an incomplete or false application *or* has engaged in fraudulent, deceptive, or dishonest practices *or* has been enjoined from fund-raising by another court with jurisdiction *or* has violated or failed to comply with a provision of the Chapter or a rule promulgated thereunder. Since they are speech neutral, the criteria set out in the statute do not directly infringe upon First Amendment rights. The four criteria that the Commissioner may use as a basis for denying, suspending or revoking a license are narrowly drawn and further the state interests of protecting the public from fraud and misrepresentation in charitable solicitations.

Heritage argues that the requirement that the Commissioner find that denying the license would be in the public interest makes the statute overbroad in that it gives to the Commissioner unbridled discretion to determine what is in the "public interest." However, the Supreme Court has stated that its "... cases have consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the purposes of the regulatory legislation." *National Association for the Advancement of Colored People v. Federal Power Commission*, 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976). The court explained that in order to give meaning to the words "public interest" in a particular statute, it is necessary to look at the purposes for which the statute was enacted. *Id.* Looking at Chapter 309 as a whole, it is clear that its purposes are to protect the public from fraud and misrepresentation in charitable solicitations and to

insure that prospective contributors are adequately informed about the nature of particular solicitations. In his sworn answers to Heritage's interrogatories, the Commissioner states that he looks to the statutory scheme to define the "public interest." This approach to the "public interest" determination narrows the statute sufficiently to meet the requirements of the First Amendment.

■■■ Heritage also claims that the procedures for obtaining a license in a contested situation, found at Minn.Stat. § 309.532, subd. 3, are unconstitutional. Heritage's argument rests upon the assumption that the license requirement discussed above constitutes a prior restraint on speech. In such a circumstance, the Supreme Court has held that Constitution requires the governmental entity to establish that the speech is unprotected, requires the governmental entity to issue the license or obtain a court order restraining the speech, and requires a guarantee of a prompt judicial determination on the merits. *Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1969). *Freedman* involved the licensing of films by the Maryland State Board of Censors. *Id.* at 52–53, 85 S.Ct. at 735–36. Therefore, what was being licensed was speech itself. In this case, the purveyors of the speech are being licensed, not the speech itself. As indicated above, the court believes that § 309.-532 constitutes a valid licensing scheme for professional fund-raisers. Therefore, the *Freedman* test is inapplicable.

■■■ Heritage specifically asserts that the order to show cause procedure provided in Minn.Stat. § 309.532, subd. 3, is unconstitutional because it places the burden of proof on Heritage to show entitlement to the license. Section 309.532, subd. 3, which provides for hearings on license applications and revocations does not have a burden of proof provision within it. However, Minnesota Rule 1400.7300, subp. 5 provides that a party proposing that an action be taken in an administrative proceeding has the burden of proof. Therefore, in a license application, the applicant has the burden of proof and in a license revocation, the state has the burden of proof. The Admin-istrative Law Judge in the state proceedings followed this allocation of proof. This allocation of the burden of proof is consistent with basic administrative process and meets the requirements of constitutional due process.

■■■ Heritage challenges the authority of the Commissioner to investigate violations of Chapter 309 and to issue cease and desist orders when he finds violations. *See* Minn.Stat. §§ 309.533, 309.534, 309.58. Section 309.533 defines the investigatory power of the Commissioner. While it is not entirely clear from its brief, Heritage apparently challenges the section on the ground that it gives to the Commissioner too much discretion. The court agrees that the Commissioner is given relatively broad authority to conduct investigations in Minn. Stat. § 309.533. That authority, however, is limited in a meaningful way. First, the Commissioner is only permitted to investigate violations or potential violations of Minn.Stat. §§ 309.50–309.61. This provision limits the investigatory power to specific violations consistent with the goals and purposes of the statutory scheme. Second, the Commissioner needs the authority given him. It would be impossible, of course, for the Commissioner to investigate all those engaged in charitable fundraising. On the other hand, it would be irresponsible for the Commissioner to simply rely on the information supplied by charities and professional fund-raisers. Therefore, the Commissioner needs to be granted sufficient authority to conduct investigations when he deems it necessary. *See Streich v. Pennsylvania Commission on Charitable Organizations*, 579 F.Supp. 172, 178 (M.D.Pa.1984).

■■■ Although not argued in their Memorandum, Heritage also challenges the authority given to the Commissioner to request a charity or professional fund-raiser to provide him with information during an investigation and to suspend or revoke a registration statement of a charity or a license of a professional fund-raiser for failing to provide the requested information. Minn.Stat. § 309.58. Again, this

court is of the opinion that the Commissioner must have this power in order to be effective. Further, any suspension or revocation must be done in accordance with Minn.Stat. § 309.532, which the court has already found to be constitutional.

■ Heritage challenges the Commissioner's authority to issue cease and desist orders. Minn.Stat. § 309.534. The court is of the opinion that this power of the Commissioner is narrowly drawn to meet the interests of Minnesota in protecting the public from fraud and misrepresentation. First, the Commissioner's discretion is limited to ordering individuals to cease and desist violations of Chapter 309. Second, there are no due process concerns with regard to the section. It requires the order to provide the individual with notice of his right to a hearing. It also requires the Commissioner to hold a hearing within seven days of a request and to issue a final order within 20 days of the hearing. Minn. Stat. § 309.534, subd. 1(a). Finally, judicial review of an adverse decision is available under Minn.Stat. § 14.63.

Heritage argues that the due process clause is violated because the administrative decision is not made by an impartial judge or jury. That argument is simply without merit as it is clearly proper for the Commissioner to both investigate and adjudicate violations of the chapter. *Withrow v. Larkin,* 421 U.S. 35, 52, 95 S.Ct. 1456, 1467, 43 L.Ed.2d 712 (1975). Heritage also asserts that § 309.534 is unconstitutional because the burden of proof is allocated to it in the administrative proceeding. Heritage is incorrect. In a cease and desist order hearing, the burden of proof is on the moving party, the Commissioner. Minn. Rule 1400.7300, subp. 5.

A number of sections in Chapter 309 either limit the manner in which charities raise funds or require charities to disclose information. The court will consider the challenged sections individually.

■ Section 309.531, subd. 2 provides that the Commissioner may require a professional fund-raiser to post a bond not in excess of $20,000. Heritage argues that the requirement is unconstitutional in that

it amounts to exacting fee for free speech. *Holy Spirit Association for the Unification of World Christianity v. Hodge,* 582 F.Supp. 592 (N.D.Tex.1984). *Holy Spirit* is distinguishable, however, in that the bond was required of the charity itself. *Id.* at 599. In this case the professional fund-raiser is required to post the bond. It is well-established that a state may require a bond as a part of regulating a business. 51 Am.Jur.2d, Licenses and Permits, § 140. Further, the Commissioner only requires a bond from professional fund-raisers who actually handle the money raised for the charity. In light of this practice, the court is satisfied that the section is narrowly drawn to serve the state interests of preventing fraud and preserving public funds.

■ Section 309.531, subd. 3 requires a professional fund-raiser to provide the Commissioner with a copy of a written authorization from its client charities to solicit on the client's behalf. Subdivision 3 further provides that the authorization must not be for time period exceeding one year. Heritage asserts that the provisions is not narrowly drawn to serve state interests. The court disagrees. The purpose of the subdivision is to insure that a professional fund-raiser has actually been authorized by a charity to raise funds. That purpose clearly serves the state interest of preventing fraud and the practice has been approved by the Supreme Court. *Cantwell v. Connecticut,* 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940). Further, the one year limitation insures that authorization is current.

■ Section 309.54, subd. 3 requires charities to maintain within Minnesota books and records pertaining to funds collected from Minnesota residents and the disbursement thereof. While copies are sufficient, they must be maintained for ten years from the date of preparation. The state asserts that this provision eases the investigatory burden of the Commissioner and that the required disclosure of finances assists in preventing fraud. The state also notes that this provision is not being enforced. The court is concerned that this provision is not narrowly drawn and may

infringe upon the First Amendment rights of charities. In particular, the court believes that the ten year requirement may be overly broad. However, since the state has not enforced the provision against Heritage or any other charity or fund-raiser, the court will not enjoin the enforcement of the statute at this time.

 Section 309.555 places limitations on the amount of expenditures that can be made in connection with charitable fund-raising. Section 309.555 provides in pertinent part:

Subd. 1a. Any charitable organization which is required to register pursuant to section 309.52 and which expends or agrees to expend an unreasonable amount for management and general costs and fund raising costs shall not be eligible to maintain registration with the department. An amount expended or agreed to be expended by a charitable organization for management and general costs and fund raising costs in excess of 30 percent of total income and revenue is presumed to be an unreasonable amount. An amount expended or agreed to be expended by a charitable organization for management and general costs and fund raising costs of 30 percent or less of total income and revenue may be challenged as unreasonable by the department or attorney general. Any expenditures made in violation of this provision shall be recoverable from the charitable organization by the attorney general.

Subd. 1b. Any professional fund raiser who receives or agrees to receive an unreasonable amount for management and general costs and fund raising costs shall not be eligible to maintain a license with the department. An amount received or agreed to be received by a professional fund raiser for management and general costs and fund raising costs in excess of 30 percent of the total contributions raised or received by reason of any solicitation activities is an unreasonable amount. An amount received or agreed to be received by a professional fund raiser for management and general costs and fund raising costs of 30 per-

cent or less of the total contribution raised or received by reason of any solicitation activities may be challenged as unreasonable by the department or the attorney general. Any expenditures made in violation of this provision shall be recoverable by the attorney general from the charitable organization or professional fund raiser or both.

The section also permits a charity to deduct from its costs of fund-raising, its costs for all goods and services sold in connection with the fund-raising. Minn.Stat. § 309.-555, subd. 2. If challenged, the charitable organization may assert as a defense that costs in excess of 30% are reasonable due to extenuating or mitigating circumstances. Minn.Stat. § 309.555, subd. 5. The constitutionality of this section must be tested against the standards set forth by the Supreme Court in *Secretary of State of Maryland v. S. H. Munson Co.*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

In *Munson*, the court tested the constitutionality of a Maryland statute remarkably similar to the one at issue in this case. The Maryland statute prohibited charitable organizations from paying or agreeing to pay an amount for fund-raising costs in excess of 25% of total gross income raised from fund-raising activity. 467 U.S. 947, 950–51 n. 2, 104 S.Ct. at 2844 n. 2. The statute permitted a charity to pay an amount in excess of 25% if the charity could show that it would otherwise be precluded from fund-raising. *Id.* Finally, the statute permitted the charity to deduct from its fund-raising costs its actual costs for goods and services provided in connection with the fund-raising activity. *Id.*

In analyzing the Maryland statute, the Court carefully reviewed its rationale in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). In *Schaumburg*, CBE was challenging an ordinance that prohibited solicitation of contributions by charitable organizations that did not use at least 75% of the receipts for charitable purposes. *Id.* at 622–25, 100 S.Ct. at 828–30. The Court in *Schaumburg* found that the percentage limitation was a direct and substantial limitation on

speech because it restricted the way in which charities could engage in solicitation activity. *Id.* at 636, 100 S.Ct. at 836. The Court further noted that the Village had a strong interest in preventing fraud upon its citizens and that it was entitled to protect that interest. *Id.* The Court concluded, however, that the ordinance was not narrowly drawn to serve the Village's interests and was, therefore, unconstitutional. *Id.* at 636–39, 100 S.Ct. at 836–37.

The Court in *Munson* noted that the only difference between the Village ordinance and the Maryland statute was that the Maryland statute provided for the possibility of a waiver of 25% limitation in instances where the 25% limitation would effectively prevent the charitable organization from raising funds. The Court found, as it did in *Schaumburg,* that the Maryland statute placed a direct restriction on First Amendment activity. *Munson* 467 U.S. at 967, 104 S.Ct. at 2853. The Court also found, however, that the means utilized to accomplish the state's objective of preventing fraud was too imprecise. *Id.* at 967–68, 104 S.Ct. at 2853. The Court stated:

> The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud. That the statute in some of its applications actually prevents the misdirection of funds from the organization's purported charitable goal is little more than fortuitous. It is equally likely that the statute will restrict First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular. On the other hand, if an organization indulges in fraud, there is nothing in the percentage limitation that prevents it from misdirecting funds. In either event, the percentage limitation, though restricting solicitation costs, will have done nothing to prevent fraud.

*Id.* at 966–67, 104 S.Ct. at 2852–53. The Court concluded that while the possibility of a waiver may have decreased the number of impermissible applications, it did not remedy its fundamental defect. *Id.* at 968, 104 S.Ct. at 2853. The Court thus found the Maryland statute unconstitutional.

There are simply no meaningful distinctions between the Maryland and the Minnesota statutes. The Minnesota statute provides for a 30% limitation rather than the 25% limitation in the Maryland statute. The difference in the amount does not materially correct the underlying flaw in the statute. The Minnesota statute words the limitation in terms of a presumption that expenditures in excess of 30% are unreasonable and may be recovered by the Attorney General. The statute also provides that a charity may overcome the presumption under certain circumstances. However, the *Munson* court found that such a waiver was not sufficient to overcome the basic unconstitutionality of the limitation. The Minnesota statute is perhaps even broader than the Maryland statute in that it permits the Commissioner to also challenge expenditures under 30% as unreasonable. Therefore, it appears that Minn.Stat. § 309.555, subd. 1a, 1b, 2 are unconstitutional under standards set by the Supreme Court in *Schaumburg* and *Munson.*

The state argues that Minn.Stat. § 309.555, subd. 1b is constitutional because it is directed to what a professional fund-raiser receives in payment or agrees to receive instead of being directed at what a charity pays. This court is of the opinion that this distinction does not make subdivision 1b constitutional. Whether the statute limits what a charity may pay or what a professional fund-raiser may receive simply does not effect the impact that the limitation has on the free speech rights of the charity.

█ Section 309.556 requires that in any charitable solicitation the identity of the charity must be fully disclosed, the percentage of the contribution that is tax deductible must be disclosed, and in cases involving professional fund-raisers, the percentage of contribution that is actually turned over to the charity must be disclosed. This section appears to be constitutional. This type of public disclosure was suggested by the Supreme Court in *Munson* and *Schaumburg* as an appropriate

way for a state to prevent fraud in charitable solicitations. *Munson,* 467 U.S. at 967–68 n. 16, 104 S.Ct. at 2853 n. 16. *Schaumburg,* 444 U.S. at 637–38, 100 S.Ct. at 836–37.

 Heritage finally challenges the rulemaking authority given to the Commissioner in Chapter 309. *See* Minn.Stat. §§ 309.532 and 309.591. This claim is without merit. First, the Commissioner has not issued in any rules under the Chapter. Second, the discretion of the Commissioner to issue rules is limited by other Minnesota statutes. *See* Minn.Stat. §§ 14.05–45.

### CONCLUSION

The court is of the opinion that a majority of the provisions of Chapter 309 are narrowly drawn to meet the strong, subordinating interests of Minnesota without unnecessarily interfering with free speech. The exception to this view is found at Minn. Stat. § 309.555, subds. 1a, 1b and 2. These provisions appear to be clearly unconstitutional due to the decisions of the United States Supreme Court in *Schaumburg* and *Munson.* A district court, however, should not declare a statute unconstitutional if a preliminary injunction will be sufficient to maintain the status quo pending a final determination of the case. *Withrow v. Larkin,* 421 U.S. at 43, 95 S.Ct. at 1462. Therefore, the court will not declare Minn. Stat. § 309.555, subd. 1a, 1b and 2 unconstitutional, but will rather preliminarily enjoin the enforcement of the provisions by the Commissioner of Commerce or the Attorney General of Minnesota.

The court notes that this disposition of the preliminary injunction should have little effect on state actions taken to date. The findings of fact, conclusions and order of Deputy Commissioner Reynaud Harp, dated April 7, 1986, effectively denies Heritage the right to conduct fund-raising activities in Minnesota until at least November 15, 1986. The order, however, is based upon violation of Chapter 309 outside of § 309.555, subd. 1a, 1b and 2. Therefore, the order may stand.

Based upon the record of case as it is presently constituted, the memoranda of law of the parties, the arguments of counsel and the foregoing, the court makes the following order.

IT IS ORDERED:

1. That motion of the Heritage Publishing Company for a preliminary injunction is granted in part and denied in part.

2. That an injunction issue, without security, preliminarily enjoining the Commissioner of Commerce and the Attorney General for the State of Minnesota, and their officers, agents or employees from enforcing Minn.Stat. § 309.555, subd. 1a, 1b and 2.